RECEIVED

OCT 26 2023

RICHARD W. NAGEL, CLERK OF COURT
COLUMBUS, OHIO

Amber Boardman
4634 Wakeford Street
Columbus, 43214
(614) 695-0609
amberboardmanofficial@gmail.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | |
|---|---|
| AMBER BOARDMAN, | Case No.: |
| Plaintiff, | 2:23 CV 3566 |
| vs. | COMPLAINT |
| THE OHIO STATE UNIVERSITY AND TERRA BRANSTOOL, NADIA HAQUE, KATHERINE LASHER, MOLLY PEIRANO, AND ALLAN WILLIAMS, in their official and individual capacities | JUDGE SARGUS MAGISTRATE JUDGE DEAVERS |
| Defendant | |

## I. INTRODUCTION

1)     Plaintiff Amber Boardman (hereinafter "Plaintiff" or "Jane Doe") brings this action against Defendants The Ohio State University ("OSU"), Terra Branstool, Nadia Haque, Katherine Lasher, Molly Peirano, and Allan Williams for a declaratory judgment, violation of Title IX, violation of civil rights under §1983, and injunctive relief.

2)     This case arises out of the decision of the Defendant to impose disciplinary sanctions against Plaintiff and terminate her employment in violation of her contractual, federal statutory, and constitutional rights.

## II. JURISDICTION AND VENUE

3)     This Court has federal question jurisdiction over the Plaintiffs' claims pursuant to Title 28 U.S.C. Section 1331, this being an action pursuant to 42 U.S.C. Sections 1981, 1983, and 2000e (Title VII of the Civil Rights Act), 20 U.S.C. Sections 1681–1688 (Title IX of the Civil Rights Act), O.R.C. Section 4112, and the United States Constitution.

4)     At all relevant times, the parties resided and conducted business, and the events herein took place, in Franklin County, within the Southern District of Ohio, Eastern Division

## III. PARTIES

5)      AMBER BOARDMAN is a United States citizen, who graduated from The Ohio State University in 2018 with a B.S. in Molecular Genetics, was enrolled in post-bacc classes in 2020, and was employed as a Research Assistant at OSU.

6)      THE OHIO STATE UNIVERSITY is a public institution of higher education located in Columbus, Ohio and is a recipient of federal funding.

7)      TERRA BRANSTOOL (née Metzger) is the Director of Affirmative Action and EEO at OSU.

8)      NADIA HAQUE is the Director of Intake & Investigations for the Office of Institutional Equity at OSU.

9)      KATHERINE LASHER was the Associate Vice President for the Office of Institutional Equity at OSU from August 2019 till April 2021.

10)      MOLLY PEIRANO was the Interim Title IX Coordinator for OSU from June 2020 to July 2021.

11)      ALLAN WILLIAMS was a Civil Rights Investigator for OSU from July 2019 to October 2020, when he was promoted to Director of Resolutions in the Office of Institutional Equity.

### IV. FACTUAL ALLEGATIONS SUPPORTING PLAINTIFF'S CLAIM

12)      In May 2018, Jane Doe obtained her bachelor's degree from The Ohio State University.

13)      On August 27th, 2018, Jane Doe began working as a full-time Research Assistant in a biomedical research laboratory at the University.

14)      The following spring, Quais Hassan began working as a Graduate Research Associate in the same laboratory as Jane Doe.

15)      During the spring semester of 2020, by nature of Mr. Hassan's involvement in the Medical Scientist Training Program ("MSTP") and Jane Doe's enrollment in post-baccalaureate classes, both parties held dual statuses as students and staff at the University.

a) Jane Doe's career path as a scientist requires enrollment in a PhD program as the next step. Her decisions to join this lab for research experience and to enroll in post-bacc classes were both with the express purpose of increasing her competitiveness before applying to PhD programs in November 2020.

16)      In January 2020, Jane Doe and Mr. Hassan initiated a romantic relationship. By the end of February, Mr. Hassan developed a tendency to physically trap Jane Doe when she attempted to leave during

COMPLAINT - 2/19

arguments, and he engaged in unlawful restraint, abduction, trespassing, and breaking and entering in violation of Ohio law to this end.

        a) For example, on March 22, 2020 (only one day before the primary incident in dispute), Jane Doe recorded video of Mr. Hassan standing in front of her car and disassembling her windshield wipers to prevent her from leaving.

17)      On March 23, 2020, the parties' supervisor ("Supervisor") called Jane Doe into the lab on short notice to conduct an experiment, and Mr. Hassan volunteered to assist.

18)      By that evening, Jane Doe and Mr. Hassan were the only individuals left at their workplace. Following an argument at her corner desk, Jane Doe ended their relationship and moved to exit. Mr. Hassan then blocked Jane Doe in and started grabbing her arms and torso whenever she tried to move past him, insisting that she must be mentally unwell and that he was only keeping her there for her own good. Jane Doe was fearful, and thoroughly exhausted any common-law duty to retreat by trying to reason with him and move around him. After this was unsuccessful, she used self-defense proportional to the threat and still for the sole purpose of escape. When Mr. Hassan had wrestled her to the floor in a rear chokehold, Jane Doe bit his arm to get him to release her, leaving temporary indentations and no serious damage. Shortly afterward, while still twisting to escape his grasp, Jane Doe sustained a tear to her medial collateral ligament (MCL).

19)      This sequence of events and characterization of Jane Doe's actions in self-defense is supported by substantial evidence:

        a) Several photos taken during the incident directly depict Mr. Hassan cornering Jane Doe, grabbing her wrists, and grabbing her phone to prevent her from calling for help.

        b) Several photos and videos taken before and after March 23rd, including only the evening before, depict a pattern of Mr. Hassan falsely imprisoning and otherwise harming Jane Doe.

        c) Mr. Hassan's version of events changed over the following years, and initially included admissions that he restrained Jane Doe against her will and that Jane Doe had not outwardly said anything that would raise concern and warrant this.

        d) The anatomy of both respondents' injuries inherently supports Jane Doe's narrative of events. An upright bite mark on the inner forearm can only reasonably be inflicted by a person between the torso

and forearm (such as if they are being grabbed from behind), and a low-speed MCL tear can only be sustained from weight-bearing twisting motions (such as when wriggling to escape such an embrace).

20)     Later the night of March 23, 2020, while still nursing her injuries in the lab, Jane Doe called Columbus Police to file a report. They directed her to file with the University's Department of Public Safety ("OSUPD") instead, as the incident occurred on campus.

21)     Jane Doe and Quais Hassan both gave statements to officers over the course of that night, and both declined to press charges against each other.

22)     Mr. Hassan submitted photos of his injuries immediately. Jane Doe did not, because she had to wait for a medical assessment to verify her MCL injury.

23)     Both officers assured Jane Doe that the report would be kept open for a few days until she acquired documentation for her own injuries. Both officers assured Jane Doe that the report was confidential, and that word of the incident would not reach Human Resources ("HR"). They misled her on both fronts.

24)     On March 24, 2020, OSUPD used the unfinished draft of the police report to generate a "Title IX Report" for the incident. Despite the fact that Jane Doe had been documented as the reporting party and victim, University personnel redacted Jane Doe's entire testimony and left Mr. Hassan's in, such that the Title IX report was biased to match the incomplete photo record.

25)     The University's Title IX office (The Office of Institutional Equity or "OIE") used this Title IX report as evidence to launch an investigation into Jane Doe for violating the Relationship Violence policy, instead of her assailant.

26)     OIE maintained distinct grievance procedures for employees and students in their "Investigation Resolution Standards," with fewer protections (such as the right to cross-examination or a hearing) afforded to employee respondents. Despite Jane Doe and Quais Hassan both being students as well as staff, OIE decided to open an "employee" investigation.

       a) The OIE's grievance procedures additionally state that they allow for informal resolution as an alternative to formal or investigative resolution. Per Department of Education guidelines, informal resolution is intended to provide parties with voluntary, cooperative, and non-disciplinary means of addressing their disputes.

COMPLAINT - 4/19

27)     All of OIE's public and internal policies at this time, including Sexual Misconduct Policy 1.15 and the Investigative Resolution Standards, were drafted, revised, and/or enforced by Katherine Lasher (Associate Vice President of OIE), Molly Peirano (Title IX Coordinator), and Nadia Haque (Director of Intake and Investigations).

28)     Under these administrators' supervision, Allan Williams was assigned as the single investigator and adjudicator for this employee investigation.

29)     On March 27, 2020, Mr. Williams met with Mr. Hassan and urged him to agree to pursuing charges and a formal investigation against Jane Doe. Mr. Hassan instead requested an informal resolution and that no disciplinary action be taken against Jane Doe.

30)     On March 30, 2020, Mr. Williams informed Mr. Hassan that, after checking with one or more of his supervisors within OIE, they had decided that a formal investigation with charges against Jane Doe would proceed anyway. Mr. Hassan reiterated his desire for an informal resolution but agreed to provide an accounting of the incident to Mr. Williams. In his testimony, Mr. Hassan repeatedly admitted that he had restrained Jane Doe against her will but claimed that this was because "she was a danger to herself or others" and was acting "hysterical."

   a) These initial interviews constitute the first signs that Jane Doe was denied the presumption of non-responsibility guaranteed in University policy. OIE finalized the decision to conclude their preliminary investigation and began building a case against Jane Doe, the victim that filed the police report, before even speaking to her.

31)     On April 3, 2020, Mr. Williams interviewed the parties' supervisor (who had no firsthand knowledge about the alleged misconduct) about any hearsay she had gathered from the parties and her perceptions of Jane Doe's mental health. The supervisor reported that she had never been concerned.

32)     Later on, April 3, 2020, Mr. Williams emailed Jane Doe for the first time to schedule a meeting. Despite Jane Doe's request for clarification, he refused to disclose the circumstances that he wished to speak to her about, the fact that she was a respondent in a formal investigation, or the policies that would apply to their conversation. He also did not provide Jane Doe with a copy of the grievance procedures in advance.

   a) The University's grievance procedures were not available on OSU's website in compliance with Title IX— the only mention of them was made in Sexual Misconduct Policy 1.15, and the appropriate link

was broken. Jane Doe was therefore unable to adequately prepare for this interview, the only fact-finding interview that she was allowed during the employee investigation.

33) During the interview on April 6, 2020, Jane Doe requested informal resolution just as Mr. Hassan had. She further requested the opportunity to send a written statement for more weighted consideration, since her verbal testimony was unprepared and scattered. Mr. Williams agreed to the latter.

34) On or around April 8, 2020, Jane Doe emailed the investigator a "BuckeyeBox" link that included the complete police report (which contained her injury documentation and original testimony to police), photos and videos establishing Mr. Hassan's history of relationship violence and false imprisonment, and a written statement thoroughly detailing the events of March 23, 2020. BuckeyeBox settings were enabled that allowed Jane Doe to monitor the investigator's interactions with the materials.

35) Allan Williams, the OIE investigator, did not save any of the evidence Jane Doe sent him. Mr. Williams clicked to view each file between one and two times in the two days after the link was sent, then did not access her evidence again. When Jane Doe added an expanded witness statement to this digital file a month later, Mr. Williams never viewed it.

a) The shared link eventually expired, but Mr. Williams did not ask for access to be renewed, and therefore could not have relied on Jane Doe's evidence when he returned to work on the Summary of Evidence months later.

36) OIE added Mr. Hassan as a co-respondent near this time, but refused to admit their mistake and retract the charges against Jane Doe. The parties were each labeled "dual complainants and respondents" in a consolidated formal investigation charging both of them with relationship violence, a decision made without the consent of either "complainant."

37) On April 10, 2020, Mr. Williams interviewed "Student A," a friend of Mr. Hassan who both parties had spoken to over the phone less than half an hour after the March 23, 2020 altercation. Student A reported that both parties gave contradictory stories, but were both clear and rational in conveying them. The investigator pressed Student A on Jane Doe's mental health and emotional affect in their conversation– a question he did not pose about Mr. Hassan– and Student A offered that Jane Doe "did sound a little hysterical."

38)     On April 17, 2020, Mr. Williams interviewed Mr. Hassan for a third time, providing Mr. Hassan the opportunity to directly respond to elements of Jane Doe's testimony and Student A's testimony. Jane Doe was not offered the same opportunity.

39)     In April 2020, Mr. Hassan returned to the workplace, as he had been absent with most other coworkers in the wake of a department-wide COVID shutdown. Jane Doe had already returned in March, as the lab's designated "essential worker." The University never issued a no-contact order between them.

40)     Mr. Hassan convinced Jane Doe to resume a relationship. This was in large part facilitated by a power imbalance, as they had shared interests in ending the pending investigations, and only Mr. Hassan could afford a lawyer at this time. In essence, Jane Doe was forced to turn to her abuser for safety and comfort against attacks by the Title IX office.

41)     Mr. Hassan's physical abuse, sexual harassment, stalking, and witness intimidation escalated, both at home and on campus. The parties' supervisor and HR had actual knowledge of at least one major conflict within the lab after the respondents had returned to work together, and the University did nothing to separate them or remedy this hostile environment.

42)     On June 23, 2020, Mr. Williams sent the Summary of Evidence to the parties, which consisted primarily of his interview notes. Mr. Williams did not update the Summary of Evidence with any novel information found in Jane Doe's written testimony, the complete police report, or Jane Doe's photo and video files. He only copied over parts of Jane Doe's own description of the evidence files, from the email in which she had sent him the link to them.

43)     On June 27, 2020, Jane Doe and Mr. Hassan reiterated their requests to OSU in writing for the cases against each other to be dropped.

44)     During a phone call with Mr. Hassan and his counsel on June 29, 2020, Mr. Williams relayed that because of OIE's (still unilateral) record of Mr. Hassan's injuries, Jane Doe would be found guilty of relationship violence regardless of the events of the investigation.

45)     During a phone call with Jane Doe on June 30, 2020, Mr. Williams assured her that the case would only be handled as an employee matter, not a student matter, so her transcript was not in jeopardy. He also assured her that self-defense and other mitigating factors would be considered for both the finding of responsibility and sanctioning. The investigator directly lied to the respondent on both counts.

COMPLAINT - 7/19

46)    Shortly thereafter, Mr. Williams emailed Jane Doe the grievance procedures governing this investigation for the first time.

47)    Once they had been sent the Summary of Evidence, Mr. Williams allowed the parties to submit corrections to the record by July 10, 2020, and instructed that they could only clarify their own previous testimony as written and not respond to other parties' testimony.

  a) Mr. Williams had never added any part of Jane Doe's witness statement to the record, so she was limited to only making factual corrections about their interview.

  b) The investigator then approved Mr. Hassan's correction to a witness's testimony to be added to the record— while Jane Doe followed instructions and was denied this opportunity.

48)    On August 13, 2020, the investigator issued his final Investigative Report– rushed one day before new Title IX regulations were set to go into effect. The respondents were issued near-identical copies, with the roles of "complainant" and "respondent" reversed.

  a) The report determined that both parties were guilty of relationship violence by using a two-prong test: they both were in a relationship and they both experienced injury. The existence of the parties' injuries and relationship status had already been uncontested from the onset of the case, and none of the testimony collected throughout the months of investigation was given any apparent preponderance or influence on the final decision.

  b) Mr. Williams also chose not to assess or apply any of the mitigating factors offered for respondents within OSU's grievance procedures, such as "any provocation by the subject of the conduct that constituted the violation" or "the degree of intent and motivation of the student in committing the violation," which on their surface encompass actions taken in self-defense to extricate oneself.

49)    On August 14, 2020, Jane Doe and Quais Hassan were terminated from employment at their lab, effective that afternoon instead of after the appeal period had elapsed. Jane Doe's termination letter and exit interview additionally indicated that she was ineligible for rehire at the University. In sanctioning as well, the individual facts of the case were explicitly not considered, nor were any of the mitigating factors described in the policy applied.

50)    Jane Doe's employee email access was revoked with no notice, and she lost access to nearly all of her email records from August 2018 through August 2020 on her OSU email account. This included potential

COMPLAINT - 8/19

evidence contained within correspondence from Mr. Hassan, records of professional achievements and activities, contact information for professional references, and records of her correspondence with OIE pertaining to this case. She also lost her copy of OSU's grievance procedures, as she had not downloaded the file and had been accessing this from Mr. William's email attachment.

   a) Despite Jane Doe explaining this rationale, OSU denied her records requests for this email history, and directly and knowingly obstructed her ability to gather key information for an appeal or for subsequent investigations.

51)  Between August 27 and 28, 2020, Jane Doe submitted a "written rebuttal," or limited appeal allowed to employee respondents to be assessed by a single adjudicator. Mr. Hassan also submitted a written rebuttal around this time.

52)  On October 16, 2020, OIE launched another investigation without warning, this time targeting Jane Doe's and Mr. Hassan's student statuses in a "double jeopardy" for the same March 23rd event. OIE again consolidated their cases into the same investigation as dual complainants and respondents, to be governed by the University's pre-8/14/2020 "old" policies. Courtney Johnson was assigned as the investigator; This was despite the fact that:

   a) Jane Doe had withdrawn from her previously scheduled Autumn classes immediately after her termination. This punitive investigation targeting Jane Doe's student status and transcript was drawn up months later, despite the fact that she was no longer a student or conducting any business on campus and did not represent any threat to the student body.

   b) As described earlier, Mr. Williams had previously told Jane Doe that because the incident occurred in the workplace, OIE considered it an employment matter instead of a student matter and that her student transcript (even more necessary for her career) would be safe.

53)  Throughout the rest of 2020 and 2021, Courtney Johnson, Molly Peirano, and Nadia Haque repeatedly denied the respondents' requests for informal and non-disciplinary resolution, and repeatedly communicated that OIE's internal policy only permitted informal resolution if the respondents agreed to confess responsibility and accept unknown sanctions. This was not reflected in OIE's published policy.

COMPLAINT - 9/19

54) In Autumn 2020, Mr. Hassan sexually assaulted Jane Doe in her home on at least three occasions. Jane Doe did not feel at liberty to report this, because of OSU's demonstrated tendency towards retaliation for reporting and deliberate indifference towards the will of complainants.

55) Jane Doe finally ended her on-and-off relationship with Mr. Hassan in December 2020.

56) On January 6, 2021, the University's Director of Affirmative Action and Equal Employment Opportunity, Terra Branstool (Terra Metzger at this time), issued answers to the respondents' rebuttals from August. She determined that Mr. Hassan would be permitted to appeal the results of his employment decision using the more "fair" student investigation, but Jane Doe would not. Even if Jane Doe were found innocent by that second investigation.

57) On January 29, 2021: Jane Doe attended a video call with Molly Peirano and Nadia Haque. During this recorded meeting, Ms. Peirano admitted that OIE does not consider self-defense because challenging investigations in the past have caused them to give up investigating entirely, and that their office automatically finds victims of relationship violence that engage in self-defense equally responsible.

> Peirano: "Self-defense is not considered in the area of dating violence. So, I can understand where that would be challenging, but that really is not in the policy definition. So therefore, not looked at during consideration. Um, you know, I think we could- could maybe have another discussion about why that is, but that's the short answer for that." ...

> ...Doe: "So– so why does OSU and OIE advertise a self-defense course if using self-defense is a violation of its policies?"

> Peirano: "Yeah, and so it really is just when it comes to relationship violence. Um, and I guess part of the reasoning is it can often be challenging to parse out primary/secondary aggressors because often relationship violence is so- what's the word I'm looking for- often can go back and forth between folks and so it is not currently written in for relationship violence."

> Doe: "So, I– I have a bunch of video evidence of him being the primary aggressor, and I have evidence that he stole my phone on March 23rd, so I couldn't get another video. So, I have evidence of those things, whereas he has no evidence of me being a primary aggressor. So, would that be considered?

*Peirano: "So, I'm sorry, it... it will not, because of how the current (um) the definition and the policy are... how it's written. And so, I'm so sorry, because I can see that this is definitely not the answer that I know you're probably looking for."*

58)     Between February and September 2021, the process of answering the parties' emailed questions and scheduling the hearing was subject to constant delays by OIE that the parties were not given explanation for.

a) OIE did not provide Jane Doe with a new copy of the grievance procedures governing her case until March 2021, several months after the case opened and after multiple requests. The grievance procedures were still not publicly available in compliance with Title IX throughout this time.

59)     On May 18, 2021, after reviewing Jane Doe's resubmitted evidence, Courtney Johnson confirmed OSU's actual knowledge of some of Mr. Hassan's other crimes in an email to Jane Doe, stating "please let me know if you would like to file a formal complaint and initiate an investigation based on content of those videos and your witness narrative that may present a possible separate violation of violations of university policy."

a) Jane Doe declined to pursue additional charges against Mr. Hassan at that time, citing safety concerns. OSU honored her request to drop this potential case against Mr. Hassan when he was the sole respondent, standing in contrast with their refusal to drop the case when Jane Doe was the sole respondent at the beginning of the March 23, 2020, investigation.

1)     On July 6, 2021, Courtney Johnson compiled all of the evidence OIE had collected to use against the respondents into a "Hearing Packet" visible to all parties in BuckeyeBox.

a) The packet showed that to initiate the student investigation, OIE submitted to itself the entire flawed employee investigation file as evidence, even after they had been provided more complete and accurate file versions in some cases. This packet again contained the incomplete draft of the police report with only Mr. Hassan's injuries, the Title IX report with only Mr. Hassan's testimony, the investigative report with Mr. Hassan's three fact-finding interviews to Jane Doe's one. This immediately, structurally precluded any opportunity for a fair and unbiased process the second time either.

60)     Sometime between May and July, OIE granted Jane Doe's request for a third-party adjudicator and hired Brett Sokolow, the president of the Association of Title IX Administrators, to this role.

61)     Upon Mr. Sokolow's meeting with Jane Doe, he confirmed that he did not interpret the language of OSU's published policies to suggest a ban on the use of self-defense (as Ms. Peirano did).

COMPLAINT - 11/19

a) Mr. Sokolow also revealed that OIE was not providing him material support in his investigation. For example, OIE failed to find and send him a building plan of the Biomedical Research Tower where the March 23, 2020 incident took place, and Jane Doe had to search for and provide this herself.

62) On October 6, 2021, a virtual hearing was conducted for the student case.

63) On October 27, 2021, Mr. Sokolow issued his report, ruling that both respondents were not guilty of relationship violence.

a) The report characterized Jane Doe's actions to extricate herself as being in good faith, and Mr. Hassan's actions to detain her as being misguided but plausibly in good faith— provided that his behavior during this incident is assessed in isolation from pattern evidence.

b) Under the model laid out, an assailant need only cite that his victim has common mental health disabilities (like depression) and claim that he believed himself to be acting in their best interest in order to be exonerated of false imprisonment.

c) Mr. Sokolow's report was subject to review and approval by University administrators before it was released, and that review process for third-party adjudications and the individuals involved were not disclosed in either the public grievance procedures or by Ms. Haque when Jane Doe inquired. This lack of transparency, OIE's previously articulated policy of giving the parties equal sanctions regardless of evidence, and the contradiction between Mr. Sokolow's condemnations of Mr. Hassan's behavior and his final determination all raise doubts as to whether the third-party adjudicator was truly given judicial autonomy.

64) On January 11, 2022, Mrs. Branstool notified Jane Doe that Mr. Hassan's lab access has been restored, citing the Violence Against Women Act as the reason for this notification without irony.

65) In May 2023, OSU permitted Mr. Hassan to graduate early from his PhD program with a master's degree. They then permitted him to resume training where he left off in OSU's College of Medicine. As of filing, to Jane Doe's knowledge, Quais Hassan is still on track to becoming a doctor with OSU's full institutional support.

66) As of filing, to Jane Doe's knowledge, she is still banned from rehire at The Ohio State University.

## V. COUNT 1: TITLE IX, 20 U.S.C. § 1681 – SEX DISCRIMINATION

COMPLAINT - 12/19

67)     Plaintiff incorporates all above paragraphs by reference.

68)     The term "sexual harassment" in the legal context of "sex discrimination" is understood to encompass all gendered violence or misconduct, including domestic/relationship violence and stalking. The conduct does not need to be overtly sexual.

69)     Quais N. Hassan, II, a student and employee of The Ohio State University, engaged in sexual harassment and sex discrimination against Jane Doe on numerous occasions, including March 23, 2020.

70)     University personnel, particularly in the Office of Institutional Equity, displayed bias and disparate treatment in favor of Mr. Hassan on multiple occasions.

71)     The frequency and brazenness of these displays of bias and disparate treatment in the handling of Jane Doe's report are plausible to support an inference of sex discrimination. Most notably:

a) The University's investigator for the employment case did not save or incorporate any of the evidence files Jane Doe submitted.

b) The University's investigator for the employment case made statements to Mr. Hassan that Jane Doe would be found guilty no matter what the investigation unearthed.

c) The University's Title IX Coordinator admitted that their investigators do not investigate the individual facts of each case, and automatically find victims of relationship violence that engage in self-defense equally responsible.

d) The University's Director of Affirmative Action and EEO determined that Mr. Hassan's employment sanctions could be reversed if exonerated upon retrial, but not Jane Doe's. This was despite the fact that the parties cited the same bases of appeal over the same case and procedure.

e) The University's contracted adjudicator for the student case ruled that Mr. Hassan's claim that he was just trying to protect Jane Doe was sufficient to absolve him of provable relationship violence.

**V. COUNT 2: TITLE IX, 20 U.S.C. § 1681 – NEGLIGENCE**

72)     The Ohio State University's actions demonstrate a pattern of negligence and deliberate indifference toward their responsibilities under Title IX and parallel federal laws.

73)     The OCR lists a 60-day guideline for investigations to minimize the impact to students and employees, with exceptions for clearly-communicated just cause, and University policy affirms this. Between the initiation of the employee investigation on March 24th, 2020, and the conclusion of the student investigation on

COMPLAINT - 13/19

October 27th, 2021, Jane Doe's future was in limbo for 582 days. The Sixth Circuit has previously found 240 days to be extreme. and the delays continued even after Jane Doe repeatedly informed OIE of this obligation and the impact this was having on her. With no 'just cause' provided to the respondents for these delays, one may question why they occurred:

a) For example, Ohio State employs a single Title IX coordinator to oversee over 100,000 students, staff, and recent alumni. For most of the duration of Jane Doe's case, this role was taken by Molly Peirano, who was concurrently a PhD student studying for her candidacy exam, balancing a third position, suffering from a concussion, and self-reportedly overwhelmed, per her social media posts. It can be assumed that this affected her ability to perform the role of Title IX coordinator, as seen in early 2021 when Ms. Peirano took multiple months to answer Jane Doe's emailed questions.

74) Even when Ms. Peirano was paying attention, the courts have held that a Title IX coordinator or office steamrolling the complainant's wishes in the absence of legal necessity constitutes deliberate indifference.

75) The Investigative Resolution Standards governing Jane Doe's employee and student investigations were not published online for the duration of those investigations, despite repeated notifications to OIE staff beginning April 6th, 2020. On August 14th, 2020, only the "new" Standards were posted, which Jane Doe was told didn't apply to her case. In itself, this is an egregious violation of the longstanding, common-sense requirement to publish any active grievance procedures

## V. COUNT 3: TITLE IX, 20 U.S.C. § 1681 – ERRONEOUS OUTCOME

76) Plaintiff incorporates all above paragraphs by reference.

77) The preponderance of evidence by any objective party supports that as a matter of factual history on March 23rd, 2020, Mr. Hassan engaged in unlawful restraint and relationship violence against Jane Doe in violation of Ohio law and University policy.

78) The preponderance of evidence simultaneously supports that on March 23rd, 2020, Jane Doe engaged in reasonable, lawful self-defense with the intent to escape and without the use of excessive force, and that this conduct did not constitute relationship violence per any defensible definition of the term.

79) The University's finding upon conclusion of the employee investigation that Jane Doe engaged in relationship violence was an erroneous outcome.

COMPLAINT - 14/19

80)     The University's finding upon conclusion of the student investigation that Quais Hassan did not engaged in relationship violence was an erroneous outcome.

### V. COUNT 4: TITLE IX, 20 U.S.C. § 1681 – RETALIATION

81)     Plaintiff incorporates all above paragraphs by reference.

82)     The Ohio State University is prohibited from retaliation against protected activities under federal law.

83)     The right to self-defense is codified in Columbus municipal law, Ohio law, constitutional law, international law, and common law, and as such is a legally protected activity in this jurisdiction.

84)     The right to self-defense or direct "resistance" to harassment has been codified by federal agencies in their guidance for civil rights law.

85)     Self-defense, by nature of these protections and when used under true duress, is a protected opposition activity under Title IX and parallel civil rights law.

a) Jane Doe provably engaged in honest, reasonable, and qualifying self-defense.

b) The University would not have pursued adverse employment and educational actions if Jane Doe had not used self-defense on March 23, 2020.

86)     Filing a police report and/or reporting an incident within the employer's internal channels are protected participation activities.

a) Jane Doe simultaneously initiated criminal and institutional processes by filing a report with OSUPD.

b) The University would not have pursued adverse employment/educational actions against Jane Doe if she hadn't reported the March 23, 2020 incident to them.

87)     OSU did not have a legitimate, non-discriminatory reason to pursue charges against Jane Doe or terminate her.

a) Jane Doe had no prior disciplinary history or negative performance evaluations during the course of her employment.

b) Jane Doe's actions did not violate written University policy, since she did not engage in relationship violence.

COMPLAINT - 15/19

c) OSU's determination that Jane Doe committed relationship violence was due to an unpublished OIE policy of defining any use of self-defense as relationship violence and discarding any evidence to the contrary, which is not legitimate or nondiscriminatory.

88)     The Ohio State University engaged in wrongful termination by terminating Jane Doe's employment on this basis.

89)     Jane Doe's termination was a disproportionate outcome. Courts have held that the corrective action should reflect the severity of the conduct. Jane Doe's conduct in self-defense was not severe, pervasive, or objectively offensive, and merited supportive care, not punishment.

90)     The Ohio State University's actions are reasonably likely to deter protected activity for others, as their zero-tolerance policy as explained and applied to Jane Doe and the guarantee of punishment would discourage most women from defending herself (e.g., pepper-spraying an assailant), or from reporting to her institution if she had so much as scratched her assailant while removing a hand from his grip.

91)     The Ohio State University's formal investigations into Jane Doe arose to the level of retaliation in and of themselves, as they were unnecessary, adversarial, discriminatory, and materially adverse to Jane Doe even before judgements and sanctions were rendered.

a) While the term "investigation" may normally imply open inquiry, labeling a student or employee as a respondent effectively creates a thesis— this investigation format incentivizes investigators to build a case against the respondent and prove the charge, rather than exploring in good faith the facts around an event in question.

i) This was demonstrated in the actions of Allan Williams and OIE towards Jane Doe throughout the employee investigation.

ii) This was demonstrated in OIE's decision to open a student charge against Jane Doe after her termination, and Molly Peirano's admission that they intended to apply the same policy definition in the same way.

92)     The University's blacklisting of Jane Doe represents continuing retaliation.

**V. COUNT 5: TITLE IX, 20 U.S.C. § 1681 – HOSTILE ENVIRONMENT**

93)     Plaintiff incorporates all above paragraphs by reference.

94)     The Ohio State University has a duty under federal law to appropriately prevent, investigate, and remedy any hostile environment or instance of sexual harassment.

95)     Quais Hassan's sexual harassment and intimidation towards Jane Doe extended to the workplace in the summer of 2020, despite ongoing OIE investigations.

> a) For example, Mr. Hassan visited Jane Doe unannounced on multiple occasions as she was maintaining research experiments in secluded rooms and start sexually touching and coercing her when she was clear that she wished to concentrate.

96)     This harassment was severe, pervasive, and objectively offensive, and harmed Jane Doe's productivity and emotional well-being.

97)     The University knew that the parties had returned to the workplace and were interacting, knew about the March 23rd abuse, knew that Jane Doe had submitted video evidence of Mr. Hassan's repeated abuse, and reasonably should have known that it would continue. Yet they did not issue any interim supportive or protective measures to keep Mr. Hassan away from Jane Doe. The onus is not simply on the victim to request it.

98)     Sexual harassment or abuse is not appropriately remedied by firing both the harasser and the victim.

99)     The failure to remedy continues. For nearly two years, the University has possessed actual knowledge of additional incidents where Mr. Hassan held Jane Doe hostage and/or caused dramatic bruising, and Ms. Johnson acknowledged these as potential violations of University policy after Jane Doe submitted more. Yet OIE has never investigated those incidents or pursued charges against Mr. Hassan for them.

> a) This highlights a double-standard, as OIE insisted that they were duty-bound to investigate and punish Jane Doe.

> b) This highlights a danger to the community, as OSU has placed Mr. Hassan in clinical rotations as part of his current medical school curriculum and is giving a known abuser access to vulnerable patient populations.

**V. COUNT 6: 42 U.S.C. § 1983:  DENIAL OF CIVIL RIGHTS UNDER STATE LAW**

100)    Plaintiff incorporates all above paragraphs by reference.

101)    The Defendants acted under color of state law with regards to the plaintiff and denied her constitutionally guaranteed right to substantive and due process.

COMPLAINT - 17/19

### V. COUNT 7: 42 U.S.C. § 1983: INDIVIDUAL LIABILITY – TERRA BRANSTOOL

102) Plaintiff incorporates all above paragraphs by reference.

103) Terra Branstool knowingly or recklessly implemented and managed a sexual assault complaint process that deprived the Plaintiff of her constitutional rights to due process and equal protection of the law.

104) Terra Branstool discriminated against Jane Doe on the basis of sex knowingly and specifically.

### V. COUNT 8: 42 U.S.C. § 1983: INDIVIDUAL LIABILITY – NADIA HAQUE

105) Plaintiff incorporates all above paragraphs by reference.

106) Nadia Haque knowingly or recklessly implemented and managed a sexual assault complaint process that deprived the Plaintiff of her constitutional rights to due process and equal protection of the law.

107) Nadia Haque discriminated against Jane Doe on the basis of sex knowingly and specifically.

### V. COUNT 9: 42 U.S.C. § 1983: INDIVIDUAL LIABILITY – KATHERINE LASHER

108) Plaintiff incorporates all above paragraphs by reference.

109) Katherine Lasher knowingly or recklessly implemented and managed a sexual assault complaint process that deprived the Plaintiff of her constitutional rights to due process and equal protection of the law.

### V. COUNT 10: 42 U.S.C. § 1983: INDIVIDUAL LIABILITY – MOLLY PEIRANO

110) Plaintiff incorporates all above paragraphs by reference.

111) Molly Peirano knowingly implemented and managed a sexual assault complaint process that deprived the Plaintiff of her constitutional rights to due process and equal protection of the law.

112) Molly Peirano discriminated against Jane Doe on the basis of sex knowingly and specifically.

### V. COUNT 11: 42 U.S.C. § 1983: INDIVIDUAL LIABILITY – ALLAN WILLIAMS

113) Plaintiff incorporates all above paragraphs by reference.

114) Allan Williams knowingly or recklessly implemented and managed a sexual assault complaint process that deprived the Plaintiff of her constitutional rights to due process and equal protection of the law.

115) Allan Williams discriminated against Jane Doe on the basis of sex knowingly and specifically.

### V. COUNT 12: BREACH OF CONTRACT

116) Plaintiff incorporates all above paragraphs by reference.

117) OSU's policies regarding its grievance procedures and code of conduct constitute a contract between student and institution.

COMPLAINT - 18/19

118)     The defendant negligently deviated from published standards and functioned under internal de facto policies in the handling of plaintiff's investigation.

## VI. JURY DEMAND

119)     Plaintiff demands a trial by jury on all issues triable by right of jury.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgement against Defendant as follows:


- That Plaintiff's eligibility for rehire at OSU be reinstated;

- That Plaintiff be awarded prejudgment and post-judgement interest at the highest rates allowable;

- That Plaintiff be awarded reasonable attorneys' fees and costs;

- That the Plaintiff be awarded all past, present, and future compensatory damages for lost wages and benefits;

- That the Plaintiff be awarded damages for injuries mental and physical sustained;

- That Plaintiff be awarded liquidated and punitive damages; and

- That Plaintiff be awarded all other legal and equitable relief which this Court may deem just and proper.

Respectfully submitted,

Amber Boardman
4634 Wakeford St.
Columbus, OH 43214
Phone: (614) 695-0609

COMPLAINT - 19/19